Sealed




**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

UNITED STATES OF AMERICA
*ex. rel.* EMILIO LOPEZ, M.D.,

20-22046-CV-WILLIAMS/TORRES

Plaintiff,

FILED *IN CAMERA* AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)

v.

DO NOT SERVE

VASCULAR AND INTERVENTIONAL SPECIALISTS, LLC, a Florida Limited Liability Company, OSCAR SOSA, M.D., PETER CLAYTON, and OSMANY DEANGELO, M.D.,

Defendants.

---

**COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT**

**INTRODUCTION**

1. On behalf of the United States of America, Qui Tam Relator Emilio Lopez, M.D. ("Relator") brings this action to recover damages and penalties under the United States False Claims Act ("FCA"), 31 U.S.C. § 3729 *et seq.* against Defendants Vascular and Interventional Specialists, LLC ("VIS"), Oscar Sosa, M.D., Peter Clayton, and Osmany DeAngelo, M.D. Defendants violated the FCA by submitting or causing the submission of false claims for payment to Medicare for medically unnecessary angioplasties during dialysis catheter removals or exchanges, angioplasties based on diagnostic fistulograms, and angioplasties in declot procedures (altogether, "Surgeries").

2. Federal law prohibits Medicare payments for "items and services which . . . are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." 42 U.S.C. § 1395y(a)(1)(A).

3. Defendants violated the FCA by knowingly submitting or causing the submission of false or fraudulent claims to Medicare for medically unnecessary Surgeries. Defendants falsified medical records to make the Surgeries appear medically necessary when they were not. Defendants also falsely certified to Medicare that the Surgeries were medically necessary, when they were not.

**JURISDICTION AND VENUE**

4. This action arises under the FCA, 31 U.S.C. § 3729 *et seq.*

5. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732(a).

6. This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) and Federal Rule of Civil Procedure 4(e).

7. Venue is proper in the Southern District of Florida pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391.

8. Under the FCA, 31 U.S.C. § 3729 *et seq.*, Relator is an "original source" of the information upon which this complaint is based.

9. The facts and other circumstances alleged in this complaint have not been disclosed by the media, in a federal administrative, criminal, or civil hearing in which the Government or its agent is a party, or in any Government Accountability Office, Congressional, or otherwise federal investigation, report, audit, or hearing.

10. Relator, prior to filing this action, voluntarily disclosed to the United States the material evidence and other information upon which Relator bases his allegations.

11. If there has been any public disclosure, prior to the filing of this action, of any aspect of the allegations or transactions involved in this complaint, Relator has knowledge that materially adds to, and is independent of, the publicly disclosed allegations or transactions.

12. All conditions precedent to filing this action have been met by Plaintiff or waived by Defendants.

**PARTIES**

13. The real party in interest to the claims set forth herein is the United States of America. Relator Emilio Lopez, M.D. is board certified in interventional and diagnostic radiology. He graduated from the University of Miami Miller School of Medicine and completed his residency at the Emory School of Medicine. After his residency, he joined Harvard Medical School as a Clinical and Research Fellow in Vascular and Interventional Imaging and completed a fellowship in Vascular Interventional Radiology at Yale-New Haven Hospital. Between his fellowship at Yale and start at VIS, Relator practiced Interventional Radiology at Jackson Radiology Associates at the Jackson-Madison County General Hospital in Jackson, Tennessee.

14. On August 1, 2018, Defendant VIS, Relator, and Premier Interventional & Diagnostic Radiology Corp. ("Relator's Corporation"), a corporation that Relator manages, entered into an Independent Contractor Agreement under which Relator, acting through his Corporation, would provide interventional radiology and endovascular services. Relator's Corporation provided its services to VIS solely through Relator. The Independent Contractor Agreement's effective date was October 1, 2018, which was the date Relator began working at VIS. Relator worked in this capacity for VIS until Relator and Relator's Corporation terminated the Independent Contractor Agreement on August 26, 2019.

15. Defendant VIS is a Florida limited liability company. Gary Tie-Shue, Oscar Sosa, and Peter Clayton constitute the sole members of VIS. Gary Tie-Shue and Oscar Sosa each respectively own 40% of VIS. Defendant Peter Clayton owns the remaining 20% of VIS. Gary

Tie-Shue is the Manager of VIS. VIS transacts business at 7887 North Kendall Drive, Suite 210, Miami, FL 33156.

16. Defendant Oscar Sosa is the Medical Director at VIS. Sosa is a radiologist specializing in vascular and interventional radiology. Sosa, who resides in Florida, is a key decision-maker at VIS and was intimately involved in the fraudulent practices that Relator alleges in this complaint, in part through his involvement in setting and overseeing VIS's billing practices and procedures. Sosa determined and entered himself the CPT billing codes and patient reports used to bill Medicare for the Surgeries Sosa performed or oversaw.

17. Defendant Peter Clayton is VIS's accountant and Executive Director. Clayton, who resides in Florida, is a key decision-maker at VIS and was intimately involved in the fraudulent practices that Relator alleges in this complaint. As VIS's accountant and Executive Director, Clayton had direct knowledge of Defendants' submission of false claims to Medicare and helped oversee VIS's collection of those claims from Medicare.

18. Defendant Osmany DeAngelo is a radiologist specializing in vascular and interventional radiology. He graduated from the University of North Texas Health Science Center College of Osteopathic Medicine and completed a fellowship in vascular and interventional radiology at Jackson Memorial Hospital. DeAngelo, who resides in Florida, performs most of the dialysis procedures at VIS and serves as the Medical Director of the Radiology residency program at Larkin Community Hospital. He is a key decision-maker at VIS and was intimately involved in the fraudulent practices that Relator alleges in this complaint, including by determining and entering himself the CPT billing codes and patient reports used to bill Medicare for the Surgeries DeAngelo performed.

## LEGAL AUTHORITY

19. The FCA, at 31 U.S.C. § 3729(a)(1), states:

> [A]ny person who (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; (C) conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G) . . . or (G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government, is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000 . . . plus 3 times the amount of damages which the Government sustains because of the act of that person.

20. The FCA, at 31 U.S.C. § 3729(b) states that under the FCA "the terms 'knowing' and 'knowingly' (A) mean that a person, with respect to information (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information; and (B) require no proof of specific intent to defraud."

## BACKGROUND ON MEDICARE AND ITS BILLING PROCEDURES

21. Congress established Title XVIII of the Social Security Act, known as the Medicare program, in 1965. Medicare provides health insurance services for individuals age 65 or older, individuals below age 65 who have certain disabilities, and individuals, regardless of age, with end stage renal disease. *See* 42 U.S.C. § 426, 426-1.

22. The U.S. Department of Health and Human Services ("HHS") operates Medicare through the Centers for Medicare & Medicaid Services, a federal agency within HHS.

23. Medicare consists of three parts. Part A covers inpatient hospital care, including nursing care and hospice services. Part B covers outpatient hospital care, medically necessary

doctors' services, diagnostic and laboratory services, and other services. Part D offers coverage for prescription drugs.

24. Medicare covers only services that are "reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." 42 U.S.C. § 1395y(a)(1)(A).

25. Doctors and other providers must agree to certain regulations and rules in order to enroll as providers in Medicare. These rules include: (a) billing for only those covered services which are medically necessary; (b) not billing for any services which were not performed or delivered in accordance with all applicable policies; (c) not submitting inaccurate or false information relating to provider costs or services; (d) not engaging in any act or omission that constitutes or results in over utilization of services; (e) being fully licensed and/or certified under all applicable state and federal laws to perform the provided services; (f) complying with the applicable state and federal statutes, policies and regulations; and (g) not engaging in any illegal activities related to the furnishing of products or services.

## DEFENDANTS' FRAUDULENT PRACTICES

### Physicians at VIS Performed Unnecessary Angioplasties During Dialysis Procedures, Including Catheter Removals and Exchanges, Fistulograms, and Declots.

26. An angioplasty is a minimally-invasive surgical procedure used to widen damaged or obstructed blood vessels (arteries or veins). During the procedure, a deflated medical balloon attached to a catheter is inserted into the blood vessel and then inflated to a set size, thus attempting to expand the vessel and improve blood flow. Angioplasties treat vascular abnormalities, including vascular stenosis or occlusions. A stenosis is a narrowing of a vessel. An occlusion is a complete blockage of a vessel.

27. Venograms and intravascular ultrasounds are diagnostic tests that determine whether a patient suffers from a vascular abnormality that would require intervention such as angioplasty. A venogram is performed by injecting contrast dye into the vein, which is subsequently visualized with an x-ray so the physician can determine the vessel's status. An intravascular ultrasound is a catheter with a tiny ultrasound at the tip that is passed through the vessel and provides an image of the space inside the vessel.

28. Performing an angioplasty requires inserting the balloon into the vessel following documentation of an abnormality, inflating the balloon slowly, and then removing the balloon.

29. Physicians at VIS performed angioplasties in three circumstances: (1) during dialysis catheter removals or exchanges; (2) based on a diagnostic fistulogram; and (3) during a declot procedure.

30. A dialysis catheter is a device used to exchange blood between a patient and a dialysis machine for patients undergoing hemodialysis for renal failure. (Hemodialysis is a procedure for purifying the blood of such patients.) If a dialysis catheter is malfunctioning, a physician must determine the cause of the malfunction. A malfunction could be caused by misalignment of the catheter or could be the result of a vascular abnormality. To assess for a vascular cause of malfunction, a physician would perform a venogram or, in rare cases, an intravascular ultrasound, to determine whether a vascular abnormality is present. If a venogram is performed and shows the presence of a vascular abnormality, angioplasty may be warranted to treat the vascular abnormality ("Dialysis Angioplasty").

31. In some cases, however, if an initial examination of the patient indicates that the dialysis catheter's malfunctioning is likely due to the catheter's misposition or kinking, it may be reasonable to exchange the catheter without first performing a venogram. In such cases, after the

catheter is exchanged, the new catheter would be tested. If the new catheter is still malfunctioning, a venogram would be performed to determine whether the malfunction results from a vascular abnormality. If the venogram shows the presence of a vascular abnormality, a Dialysis Angioplasty may be warranted.

32.   Moreover, an angioplasty is rarely warranted during a catheter removal. Dialysis catheter exchanges occur in situations that far more frequently warrant performing an angioplasty. This is because a catheter exchange is performed to fix a problem—the malfunction of the catheter. Catheter removals, in contrast, are normally performed at bedside in the setting of a normally functioning catheter. While physicians perform angioplasties, technicians and nurses are commonly trained to perform, and do perform, bedside catheter removals. It is not common for technicians and nurses to be trained on performing, or to perform, catheter exchanges.

33.   A Dialysis Angioplasty is medically necessary only if a venogram or intervascular ultrasound is performed and shows a vascular abnormality justifying the procedure.

34.   Angioplasties may also be performed based on a diagnostic fistulogram ("Fistulogram Angioplasty") or after a declot procedure ("Declot Angioplasty"). A fistula is a connection between an artery and a vein, which is accessed to perform hemodialysis.

35.   If a fistula is not functioning appropriately, it is medically necessary to perform a fistulogram to determine the cause of the malfunction and the type of intervention necessary to repair the fistula. A fistulogram is a diagnostic procedure in which dye is injected into the fistula, which is visualized by x-ray. The procedure is performed similarly to a venogram. Fistula malfunctions can be caused by various factors, including vascular stenosis and occlusions throughout the length of the fistula, including the central thoracic veins.

36. A Fistulogram Angioplasty is appropriate only if the malfunction is caused by a flow limiting stenosis with narrowing greater than 50% or occlusion. The need for a Fistulogram Angioplasty cannot be determined without a fistulogram or intravascular ultrasound. A Fistulogram Angioplasty is medically necessary only if a fistulogram is performed and indicates that an angioplasty is medically necessary to repair the fistula.

37. A declot procedure is performed by injecting thrombolytics, medications that break up bloodclots, into an occluded fistula or graft to break up a thrombus, a bloodclot. Following the removal of a thrombus, a fistulogram is performed to localize the abnormality that might have caused the fistula to clot. If the fistulogram shows flow limiting stenosis or occlusion, angioplasty may be warranted. The need for an angioplasty after a declot procedure—a Declot Angioplasty—is based on fistulogram findings. A Declot Angioplasty is medically necessary only if a fistulogram is performed and indicates that it is required.

38. Medically unnecessary Dialysis Angioplasties, Fistulogram Angioplasties, or Declot Angioplasties pose substantial and unacceptable risks to patients. These substantial risks include, but are not limited to, progression to symptomatic narrowing of a patient's veins or arteries which were potentially normal at time of angioplasty, and death.

39. All the specific examples of patient cases discussed below are mentioned for illustrative purposes only and represent only a small portion of those cases of which Relator is personally aware in which Defendants submitted false claims to Medicare and received payment from Medicare on those claims.

40. Each physician at VIS personally prepared the patient reports and entered the CPT codes that VIS used to bill Medicare for that physician's services, including the Surgeries that are

the subject of this complaint. This was done with the knowledge and involvement of VIS's management, including Sosa, Clayton, and others working for VIS.

**From 2015 to at least 2019, Defendants Knowingly Submitted or Caused to Be Submitted False Claims to Medicare for Dialysis Angioplasties.**

41. In 2015, Defendants falsified medical records in order to justify billing Medicare for Dialysis Angioplasties, and falsely certified to Medicare that Dialysis Angioplasties were medically necessary.

42. In 2015, almost all the Dialysis Angioplasties that Defendants submitted to Medicare were medically unnecessary because Defendants either (a) did not perform venograms or intravascular ultrasounds justifying them or (b) falsified venogram results to justify them.

43. Defendants performed many of the Dialysis Angioplasties despite never having obtained any venogram or intervascular ultrasound, let alone venograms or intervascular ultrasounds showing abnormalities that would make the Dialysis Angioplasties medically necessary.

44. Moreover, even in the few cases for which Defendants actually obtained venograms, Defendants' Dialysis Angioplasties were predicated on fraud. When Defendants obtained a venogram indicating the absence of abnormalities, Defendants falsified the venogram's results by fraudulently stating on the patient's medical record that the venogram showed abnormalities.

45. Relator possesses information identifying certain specific procedures in which Defendants committed the fraud described in this complaint. Full records of these procedures are, and have at all times been, in the possession of Defendants. Because he is no longer working with Defendants, Relator does not have access to all records that would provide further details, but he

does possess certain materials, and more information about the procedures can be identified using the information provided herein.

46. As a specific example illustrative of the fraud, a patient (chart number 18518) received Dialysis Angioplasty on December 31, 2015, during a catheter exchange. Although the patient's chart falsely claims that a venogram showed an abnormality warranting treatment, no venogram was in fact performed. Nonetheless, VIS submitted a claim for payment under Medicare, which it received.

47. As another example, another patient (chart number 17488) received Dialysis Angioplasty on December 31, 2015, during a catheter removal. Again, although the chart indicates that a venogram was performed showing an abnormality warranting treatment, the images in the patient's file do not contain a venogram, and no venogram was performed. Nonetheless, VIS still submitted a claim for payment under Medicare, which it received.

48. Starting in 2016, Defendants practically ceased performing venograms. From 2016 to at least April 2019, Defendants performed essentially no venograms or intravascular ultrasounds, yet continued to bill Medicare for Dialysis Angioplasties. From 2016 to 2017, Defendants justified the procedure by fraudulently stating on patient medical records that they performed venograms that showed abnormalities.

49. As specific examples, on April 20, 2016, a patient (chart number 17739) received a Dialysis Angioplasty as part of a catheter removal. The patient, however, received no venogram. VIS still submitted a claim for payment under Medicare, which it received.

50. In June 2016, one patient (chart number 1622) received a Dialysis Angioplasty after a catheter removal despite no venogram being performed. VIS still submitted a claim for payment under Medicare, which it received.

51. In July 2016, another patient (chart number 20086) received a Dialysis Angioplasty after a catheter exchange even though no venogram was performed. VIS still submitted a claim for payment under Medicare, which it received.

52. As another example, on July 26, 2016, one patient (chart number 18899) received a Dialysis Angioplasty as part of a catheter removal. A venogram was in fact performed on that date, but the venogram showed no abnormalities. VIS still submitted a claim for payment under Medicare, which it received.

53. On July 27, 2017, another patient (chart number 23562) received a Dialysis Angioplasty as part of a catheter exchange, even though no venogram was ever performed. On August 17, 2017, this same patient received yet another Dialysis Angioplasty as part of a catheter exchange, even though once more no venogram was performed. VIS submitted both Dialysis Angioplasties for payment under Medicare, which it received.

54. On January 10, 2018, a patient (chart number 24116) received a Dialysis Angioplasty as part of a catheter removal, even though no venogram was ever performed. VIS still submitted a claim for payment under Medicare, which it received.

55. Beginning in 2018, Defendants changed their tactics. Instead of claiming Dialysis Angioplasties were justified by venograms which, in reality, Defendants never performed, Defendants stated in patient medical records that the Dialysis Angioplasties were "prophylactic." "Prophylactic" Dialysis Angioplasties are facially medically unnecessary because they are performed without evidence documenting that the patient suffers from a vascular abnormality justifying a dialysis angioplasty.

**From 2015 to at least 2019, Defendants Knowingly Submitted or Caused to Be Submitted False Claims to Medicare for Fistulogram Angioplasties.**

56. From 2015 to at least 2019, Defendants falsified medical records in order to justify billing Medicare for Fistulogram Angioplasties, and falsely certified to Medicare that Fistulogram Angioplasties were medically necessary.

57. From 2015 to at least April 2019, Defendants submitted to Medicare claims for Fistulogram Angioplasties for cases in which Defendants either (1) did not actually perform any diagnostic fistulograms or (2) performed diagnostic fistulograms that showed no abnormalities justifying an angioplasty. In both types of cases, Defendants fraudulently claimed on patient medical records and certified to Medicare that Defendants performed diagnostic fistulograms that found abnormalities justifying angioplasties.

58. Because a Fistulogram Angioplasty is medically necessary only if a diagnostic fistulogram is performed that shows an abnormality, the angioplasty cases based on fraudulent diagnostic fistulograms were medically unnecessary.

59. As a specific example, on January 30, 2018, a patient (chart number 12849) received a Fistulogram Angioplasty, but no fistulogram was ever performed. VIS still submitted a claim for payment under Medicare, which it received.

60. As other examples, on July 11, 2019, a patient (chart number 20620) received a Fistulogram Angioplasty, even though no fistulogram was performed. VIS still submitted a claim for payment under Medicare, which it received.

61. The same occurred with another patient (chart number 17907) on August 22, 2019. VIS still submitted a claim for payment under Medicare, which it received.

**From 2015 to at least 2019, Defendants Knowingly Submitted or Caused to Be Submitted False Claims to Medicare for Declot Angioplasties.**

62. From 2015 to at least 2019, Defendants falsified medical records in order to justify billing Medicare for Declot Angioplasties, and falsely certified to Medicare that Declot Angioplasties were medically necessary.

63. From 2015 to at least April 2019, Defendants submitted to Medicare claims for Declot Angioplasties in cases in which Defendants either (1) did not actually perform any fistulograms or (2) performed fistulograms that showed no abnormalities justifying a Declot Angioplasty. In both types of cases, Defendants fraudulently stated in patient medical records and certified to Medicare that Defendants performed fistulograms that found abnormalities justifying Declot Angioplasties.

64. Because a Declot Angioplasty is medically necessary only if a fistulogram is performed that shows an abnormality, the Declot Angioplasties based on fraudulent fistulograms were medically unnecessary.

65. Indeed, on May 15, 2019, one patient (chart number 27390) received a Declot Angioplasty at VIS, even though that patient did not receive a fistulogram. VIS still submitted a claim for payment under Medicare, which it received.

**Defendants All Knew of the Fraudulent Practices and Repeatedly Ignored Relator's Repeated Efforts to Have Defendants Cease Their Unlawful Conduct.**

66. In December 2018, Relator told Defendant Sosa, VIS's Medical Director, that Relator was concerned that Defendants were performing, and billing Medicare for, medically unnecessary Dialysis Angioplasties during dialysis catheter removals. Sosa attempted to justify Defendants' performance of these unnecessary angioplasties in part by noting how well Medicare reimbursed Defendants for these angioplasties. Relator was unaware, as of December 2018, that

Defendants were also performing medically unnecessary Fistulogram Angioplasties, Declot Angioplasties, or Dialysis Angioplasties during dialysis catheter exchanges.

67. In January or February 2019, Relator and another physician at VIS raised concerns with Sosa and Gracie Recio, VIS's Office Manager, that Defendants were performing and billing Medicare for medically unnecessary Dialysis Angioplasties during dialysis catheter removals. Another physician working at VIS shared Relator's concerns and joined him in raising them to Sosa and Recio. Recio defended the practice in part by noting that reimbursements for Dialysis Angioplasties during dialysis catheter removals were an important source of Defendants' profits. Sosa listened throughout the conversation but made no comments, never disputing Relator's concerns or Recio's attempted justification.

68. In January or February 2019, the other physician who shared Relator's concerns raised these concerns to Defendant DeAngelo. He told DeAngelo that Defendants were performing and billing Medicare for medically unnecessary Dialysis Angioplasties during dialysis catheter removals. DeAngelo, who performed almost all Dialysis Angioplasties at VIS, did not defend the medical necessity of the procedures during his conversation with this physician.

69. In March 2019, Relator spoke with DeAngelo regarding separate concerns he had about VIS's billing practices relating to its use of medical residents in programs at Palm Springs General Hospital and Larkin Community Hospital.

70. In March or April 2019, Defendant Clayton asked Relator to participate in an inappropriate plan for radiology services at Westchester Hospital. According to Clayton, Defendants were planning on having residents at Larkin Community Hospital and Palm Springs General Hospital perform diagnostic radiology readings from VIS's office for patients at Westchester General Hospital. DeAngelo would sign off on the readings without actually

reviewing them. Defendants, in turn, would bill Medicare as if DeAngelo had reviewed the readings. Clayton told Relator that if Relator agreed to be the face of the program, Defendants would offer Relator 5% of the gross billings collected. When Relator declined, stating the proposal was unethical and illegal, Clayton offered to compensate Relator "under the table." Relator refused to participate in the proposed program. Relator then informed Sosa of his concerns regarding the program and desire not to be involved with it.

71. On May 10, 2019, Relator met with Sosa, Clayton, and Tie-Shue. Relator reiterated his concerns regarding Defendants' practices.

72. In May or June 2019, Relator became aware that Defendants were continuing to perform and bill Medicare for medically unnecessary Dialysis Angioplasties during dialysis catheter removals and further began to notice that Defendants were performing a significant volume of these fraudulent procedures. At this time, Relator also learned that Defendants were performing fraudulent Dialysis Angioplasties during catheter exchanges, Fistulogram Angioplasties, and Declot Angioplasties. Defendants were engaging in these fraudulent practices despite Relator's earlier conversations raising concerns about such practices.

73. In June 2019, Relator spoke with Clayton about Defendants' continuing practices regarding Dialysis Angioplasties during dialysis catheter removals and Relator's realization that Defendants' fraud extended as well to Dialysis Angioplasties during dialysis catheter exchanges, Fistulogram Angioplasties, and Declot Angioplasties. Despite telling Relator that he would follow up with Relator regarding Relator's concerns, Clayton never followed up or took any efforts to stop this conduct.

74. On June 14, 2019, Relator also reiterated his concerns to Sosa, who took no action to stop them.

75. On August 23, 2019, Relator again discussed Defendants' fraudulent practices with Clayton, Sosa, and DeAngelo. At the meeting, Clayton, Sosa, and DeAngelo offered no explanation for how the Surgeries were medically necessary and nonfraudulent. Defendants made it clear to Relator that their practices would continue despite Relator's repeated protestations.

76. On various occasions, Sosa laughed off Relator's concerns. For example, he stated that if the government audited VIS, DeAngelo would be the only one going to "jail." He also commented that "nobody ever has to pay any of the money back."

77. On August 26, 2019, Relator, through Relator's Corporation, resigned from VIS.

## CAUSES OF ACTION

## COUNT I

**False or Fraudulent Claims**
**False Claims Act, 31 U.S.C. § 3729(a)(1)(A)**
**(Against All Defendants)**

78. Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 77 of this complaint.

79. Defendants knowingly presented or caused to be presented to an officer, employee, or agent of the United States false or fraudulent claims, namely, the Surgeries, for payment by the Medicare program, in violation of 31 U.S.C. § 3729(a)(1)(A).

80. The United States, through the Medicare program, paid such false or fraudulent claims because of Defendants' acts.

81. Due to Defendants' conduct in violation of 31 U.S.C. § 3729(a)(1)(A), the United States has suffered actual damages, including the total amounts the United States paid in response to the Defendants' false and fraudulent claims for payment. The United States is entitled to recover civil monetary penalties, and all other relief as deemed appropriate.

## COUNT II

**False Records or Statements Material to False Claims**
**False Claims Act, 31 U.S.C. § 3729(a)(1)(B)**
**(Against All Defendants)**

82. Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 77 of this complaint.

83. Defendants knowingly made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim, namely, the Surgeries, in violation of 31 U.S.C. § 3729(a)(1)(B).

84. The United States, through the Medicare program, paid such false or fraudulent claims because of Defendants' acts.

85. Due to Defendants' conduct in violation of 31 U.S.C. § 3729(a)(1)(A), the United States has suffered actual damages, including the total amounts the United States paid in response to the Defendants' false and fraudulent claims for payment. The United States is entitled to recover civil monetary penalties, and all other relief as deemed appropriate.

## COUNT III

**Conspiracy**
**False Claims Act, 31 U.S.C. § 3729(a)(1)(C)**
**(Against All Defendants)**

86. Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 77 of this complaint.

87. Defendants conspired to commit a violation of 31 U.S.C. § 3729(a)(1)(A), (B), (D), (E), (F), or (G) in violation of 31 U.S.C. § 3729(a)(1)(C).

88. The United States, through the Medicare program, paid such false or fraudulent claims, namely, the Surgeries, because of Defendants' acts.

89. Due to Defendants' conduct in violation of 31 U.S.C. § 3729(a)(1)(C), the United States has suffered actual damages, including the total amounts the United States paid in response to the Defendants' false and fraudulent claims for payment. The United States is entitled to recover civil monetary penalties, and all other relief as deemed appropriate.

**COUNT IV**

**Unjust Enrichment**
**(Against All Defendants)**

90. Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 77 of this complaint.

91. This is a claim under federal common law for the recovery of monies by which Defendants have been unjustly enriched.

92. Due to Defendants' conduct described in this complaint, Defendants were unjustly enriched at the expense of the United States in an amount to be determined, which, under the circumstances, in equity and good conscience, should be returned to the United States.

**JURY DEMAND**

Relator demands a trial by jury on all issues so triable.

**PRAYER FOR RELIEF**

Wherefore, Relator respectfully prays for judgment in its favor as follows:

a. That this Court enter judgment against Defendants in an amount equal to three times the amount of damages that the United States has sustained because of Defendants' acts, plus a civil penalty of $11,000 for each violation of 31 U.S.C. § 3729, and the costs of this action, with interest, including costs to the United States for its expenses related to this action;

b. That the Relator be awarded all costs incurred, and reasonable attorneys' fees;

c. That, in the event the United States intervenes in this action, Relator be awarded 25 percent of any proceeds of the claim, and that in the event the United States Government does not intervene, Relator be awarded 30 percent of any proceeds;

d. That the United States and Relator shall receive all further relief, both legal and equitable, to which they may reasonably be entitled.

Dated: May 15, 2020

Respectfully Submitted,

GERALD E. GREENBERG
Florida Bar No. 440094
ggreenberg@gsgpa.com
FREDDY FUNES
Florida Bar No. 87932
ffunes@gsgpa.com
ANDREW J. FULLER
Florida Bar No. 1021164
afuller@gsgpa.com
GELBER SCHACHTER & GREENBERG, P.A.
1221 Brickell Avenue, Suite 2010
Miami, Florida 33131
Telephone: (305) 728-0950
Facsimile: (305) 728-0951
E-service: efilings@gsgpa.com

*Counsel for Relator Emilio Lopez, M.D.*